UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

STEVEN W. COMPTON and CRYSTAL
PAULEY,

       Plaintiffs,

v.                         Civil Action No. 2:16-cv-09298

SGT. LARRY G. O'BRYAN,
individually; SGT. TRAVIS BERRY,
individually; TROOPER JOSEPH M.
COMER, individually; TROOPER
BRADLEY LOWE, individually;
TROOPER ROBERT MINOR,
individually; TROOPER S.L.
YARBER, individually; and
TROOPER J.R. POWERS,
individually,

       Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

Pending is a motion for partial summary judgment,
filed by defendants Larry O'Bryan, Joseph Comer, Bradley Lowe,
Robert Minor, S.L. Yarber, and J.R. Powers on September 21,
2017. Defendant Travis Berry does not join in this motion
because this action is stayed as to him, pursuant to the court's
August 21, 2017, order. (<u>See</u> Mem. Supp. 1.) Sergeant Berry
"was ordered to active military duty and was not able to be
deposed prior to his deployment, despite a good faith attempt by
the parties to do so." Court's August 21, 2017, order (ECF
#28).

As an initial matter, after the court's December 28, 2016, order of dismissal, nine of the plaintiffs' original ten claims remained.  In response to the pending motion, the plaintiffs now stipulate to various dismissals of their remaining claims.

> Plaintiff Crystal Pauley stipulates to the dismissal of all [c]ounts against all defendants.  Plaintiff Steven Compton stipulates to the dismissal of all counts against Defendant Larry O'Bryan, Defendant Robert Minor, Defendant S.L. Yarber, and Defendant J.R. Powers.

(Resp. Opp'n 1.)  Furthermore, Mr. Compton also stipulates to the dismissal of Counts II, V, VII, and X against Sergeant Berry, Trooper Lowe, and Trooper Comer and to the dismissal of Count IX against Mr. Comer.  (See id. 3, 6-7.)

Thus, in accordance with the plaintiffs' stipulations, Ms. Pauley's claims are dismissed; Mr. Compton's claims against Sergeant O'Bryan, Trooper Minor, Trooper Yarber, and Trooper Powers are dismissed; Counts II, V, VII, and X against Sergeant Berry, Trooper Lowe, and Trooper Comer are dismissed; and Count IX against Trooper Comer is dismissed.  Only Mr. Compton remains as a plaintiff in this action, and his surviving claims are as follows: Counts I (excessive force), III (battery), IV (assault), and VI (intentional infliction of emotional distress) against Sergeant Berry, Trooper Lowe, and Trooper Comer and

Count IX (bystander liability) against Sergeant Berry and Trooper Lowe.

## I. Background

Mr. Compton was a resident of South Charleston, West Virginia, at all times relevant herein. (Mem. Supp., Ex. 1 at 1-2.) Sergeant Berry and Trooper Lowe were members of the "Special Response Team," which is activated when police anticipate facing a "high risk" situation. (Deposition of Trooper Lowe ("Lowe Dep.") 6-7.) Trooper Comer was a member of a separate special operations team. (Id. 7.)

Sometime prior to October 8, 2014, Mr. Compton's ex-girlfriend, Kimberly Derkin, reported to the police that Mr. Compton was planning to murder Trooper Minor in retaliation for a prior arrest and that Mr. Compton was a drug dealer. (Lowe Dep. 10-11; Deposition of Steven W. Compton ("Compton Dep.") 39; Deposition of Crystal Pauley ("Pauley Dep.") 34.) According to Ms. Derkin, Mr. Compton had recently acquired a gun, was violent, had been following Trooper Minor to his home, and had been calling Trooper Minor's police detachment in an effort to learn his schedule. (Lowe Dep. 10-11; Compton Dep. 39.) Ms. Derkin evidently gave the police "a description roughly" of where Trooper Minor lived based on Mr. Compton's alleged

activities. (Deposition of Trooper Minor ("Minor Dep.") 8.)
Mr. Compton does not deny calling Trooper Minor's police
detachment, but he claims that he called attempting to retrieve
some of his belongings, such as his driver's license, that were
confiscated during the prior arrest. (Compton Dep. 39.)

On October 8, 2014, Sergeant Berry, Trooper Lowe, and
Trooper Comer (together, the "Troopers") executed arrest and
search warrants for Mr. Compton. (See Mem. Supp., Ex. 1 at 1-2;
Lowe Dep. 7, 10-11.) The Troopers, donning tactical "kits"
including vests and helmets, waited for Mr. Compton near his
home address, with Sergeant Berry and Trooper Lowe in a van and
Trooper Comer in a marked police car. (See Deposition of
Trooper Comer ("Comer Dep.") 6-7.)[1] From this point forward, the
parties recount starkly divergent stories of what happened
during and after the arrest.

In his description of the events, Mr. Compton states
that he cannot remember who attacked him, just that the

---

[1] Evidently, additional officers – Sergeant Larry O'Bryan,
Trooper S.L. Yarber, and Trooper J.R. Powers, as well as
officers Hensley and Barker - may have been present at the scene
on October 8, either during or after Mr. Compton was taken into
custody. (See Lowe Dep. 6-9; Pauley Dep. 49-51; Affidavit of
Larry O'Bryan ¶¶ 2-3; Affidavit of J.R. Powers ¶¶ 2-3.) Each of
these officers either were not named as defendants in this
action or have been voluntarily dismissed by the plaintiffs.
Thus, the recitation of the facts focuses solely on the
remaining defendants.

attackers were police officers.  (Compton Dep. 66.)  The
officers told him to put up his hands and pulled him from his
vehicle.  (Id.)  Then, the officers threw him face-first onto
the ground, hit him in the back of the head with the butt of a
shotgun, and cuffed his hands behind his back.  (Id.)  He cannot
recall the sequence of those three events because "it knocked
[him] out for a few seconds."  (Id. 66-67, 69).  Mr. Compton
regained consciousness to the officers having sicced a dog on
his left arm while he was unconscious, where the dog held its
bite and "chew[ed]" for five minutes.  (Id. 67-69.)

Additionally, Mr. Compton claims that, while
handcuffed, the officers kicked him in the ribs "[a] couple" of
times and punched or struck him in the head with an object
"about three times."  (Id. 67-68.)  The blows to the head
occurred as the officers interrogated him, asking questions such
as whether he knew Trooper Minor and Ms. Derkin.  (Id. 68-69.)
The officers also berated Mr. Compton during the beating, raving
"you know Trooper Minor[,] . . . I trained him, I worked with
him, he's a good friend of ours, you know, you think you're
going to treat one of our, you know, police, you know, brothers
this way."  (Id. 68.)

According to Troopers Lowe and Comer, Sergeant Berry
and Trooper Lowe approached Mr. Compton's vehicle, where Trooper

Lowe opened the door, announced their presence, and instructed Mr. Compton to show his hands and exit the vehicle. (Lowe Dep. 18.) Mr. Compton refused. (Id.) Sergeant Berry then tried to pull Mr. Compton out of the vehicle, but Mr. Compton grabbed the steering wheel and "slapp[ed] at Sergeant Berry's arms." (Id.) Sergeant Berry continued to struggle with Mr. Compton, pulling on and striking at Mr. Compton's arms. (Id. 18-20.) Since Sergeant Berry could not by himself remove Mr. Compton from the vehicle, one of Sergeant Berry or Trooper Lowe shouted "dog up" – a command used both to request the assistance of a police dog and to announce the police dog's approach. (Id. 19; see Comer Dep. 6-8.)

From Trooper Comer's perspective, he "hook[ed] up the dog" while Sergeant Berry and Trooper Lowe approached Mr. Compton's vehicle. (Comer Dep. 6-7.) As he approached, Trooper Comer could hear the others shouting commands at Mr. Compton. (Id.) He stopped next to the front driver's side tire of the police van, which was parked behind Mr. Compton's vehicle, until he heard Sergeant Berry shout "dog up." (Id. 7-8; see Lowe Dep. 19.) Trooper Comer confirmed with his own "dog up," approached the vehicle, and sicced the dog onto Mr. Compton's left arm after Mr. Compton refused Trooper Comer's command to exit the vehicle. (Comer Dep. 7-8; see Lowe Dep. 19.)

Although the dog had latched onto Mr. Compton's arm, he still refused to exit the vehicle. (Comer Dep. 11.) Sergeant Berry and the dog then forcefully removed Mr. Compton from the vehicle and onto the ground. (Id. 11-12; Lowe Dep. 19.) Mr. Compton tucked his arms under his body, and Trooper Lowe assisted Sergeant Berry in getting Mr. Compton's arms behind his back and handcuffing him. (Comer Dep. 12; Lowe Dep. 20.) After the handcuffs were on, Trooper Comer gave the dog the release command, and the dog released its bite. (Comer Dep. 12.) Finally, the Troopers searched Mr. Compton and waited for additional officers to arrive and transport him away. (Lowe Dep. 23.)

The Troopers deny using against Mr. Compton anything other than physical presence, verbal commands, "empty hand tactics" to the torso area, and a police dog. (See id. 23-24; Comer Dep. 12-13.) "Empty hand tactics" are essentially the use of hands without a weapon. (See Lowe Dep. 19-20.) Troopers Comer and Lowe deny that Mr. Compton was ever struck on the head. (Id. 23; Comer Dep. 12-13.) Trooper Comer denies ever personally touching Mr. Compton, although the police dog bit and released upon his command. (See Comer Dep. 9-12.)

For her part, Ms. Pauley, who was also arrested that night, claims that she never saw the Troopers strike Mr.

Compton, although she did witness the police dog on Mr. Compton's arm. (Pauley Dep. 43-44.) However, Trooper Powers had "slammed [her] down onto the road" and arrested her about fifty or sixty feet from Mr. Compton, preventing her from seeing Mr. Compton until she was loaded into a police car. (See id. 36-39, 44, 50.) Trooper Powers denies being at the scene when Ms. Pauley was arrested. (Affidavit of J.R. Powers ¶ 2.)

As a result of his arrest, Mr. Compton suffered a laceration to his head and various injuries to his left arm. (See Resp. Opp'n, Ex. 4 Pictures of Mr. Compton's Injuries.) The head laceration required stapling, and the injuries to his left arm required stiches. (Compton Dep. 81.) Dr. Michael Sitler, an emergency medicine physician, swears as follows regarding Mr. Compton's head laceration:

> To a reasonable degree of medical certainty, it is my opinion that the laceration on Mr. Compton's head was caused by the blunt force trauma of an object with a rounded end or edge. In my opinion, Mr. Compton's head injury was caused by an object, not a closed fist, elbow, or dog bite.

(Affidavit of Dr. Michael Sitler ¶¶ 1-3.)

Mr. Compton filed suit against the Troopers in this court on October 3, 2016. As earlier described, five of Mr. Compton's claims have survived to this point. Against the Troopers, Mr. Compton brings claims of excessive force (Count I), battery (Count III), assault (Count IV), and intentional

infliction of emotional distress (Count VI).  Against Sergeant
Berry and Trooper Lowe, Mr. Compton brings a claim of bystander
liability (Count IX).  Mr. Compton seeks, <u>inter alia</u>, damages,
attorney's fees and costs, injunctive relief, and declaratory
judgment.  (Compl. WHEREFORE Clause).

Troopers Lowe and Comer move the court for entry of
summary judgment on Count VI.[2]  They argue that Mr. Compton has
failed to allege that he has suffered any emotional distress as
a consequence of his arrest, (Mem. Supp. 18; Reply Supp. 2-3),
and, at any rate, Mr. Compton's intentional infliction of
emotional distress claim is "duplicative" of his assault and
battery claims, (Reply Supp. 3-4).  If the court rejects these
arguments, Troopers Lowe and Comer insist that qualified
immunity otherwise shields them from liability.  (Mem. Supp.
18.)  Additionally, Trooper Lowe moves the court for entry of
summary judgment on Count IX, asserting that Mr. Compton cannot
claim that Trooper Lowe simultaneously attacked him and
passively observed his attack.  (<u>Id.</u> 23; Reply Supp. 4-5.)  Mr.
Compton maintains that genuine disputes of material fact persist
regarding both claims.  (Resp. Opp'n 5-7.)

---

[2] This action is stayed as to Sergeant Berry, as earlier noted.
<u>See</u> Court's Order of August 21, 2017.

## II. Motion for Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

"As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2725 (2nd ed. 1983)).

Regarding genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The moving party has the initial burden of "'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). If the movant carries its burden, the non-movant must demonstrate that "there is sufficient evidence

favoring [it] for a jury to return a verdict" in its favor. Anderson, 477 U.S. at 249 (citation omitted); see also Dash, 731 F.3d at 311. "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Dash, 731 F.3d at 311 (citing Anderson, 477 U.S. at 252, and Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 191 (4th Cir. 1997)).

## III. Discussion

### A. Intentional Infliction of Emotional Distress

To prove intentional infliction of emotional distress ("IIED") in West Virginia, a plaintiff must establish

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. Pt. 7, <u>Hatfield v. Health Mgmt. Assocs. of W. Va.</u>, 223 W. Va. 259, 262 (2008) (quoting Syl. Pt. 3, <u>Travis v. Alcon Labs., Inc.</u>, 202 W. Va. 369 (1998)).

In <u>Criss v. Criss</u>, 177 W. Va. 749 (1987), the Supreme Court of Appeals of West Virginia observed the following in regards to the "duplicitous" nature of claims for assault and battery and for IIED:

> In the present case, the claim for the tort of [IIED] is duplicitous of the claim for assault and battery. As noted above, if a jury finds that the proof sustains the appellant's complaint, she will be able to recover compensatory and punitive damages against the appellee as a result of the assault and battery, including elements of emotional distress. Therefore, it would be inappropriate to allow her to also recover damages based on the tort of [IIED].

<u>Id.</u> at 751 (citing <u>Bankhead v. City of Tacoma</u>, 23 Wash. App. 631, 638 (1979); <u>Todd v. S.C. Farm Bureau Mut. Ins. Co.</u>, 283 S.C. 155 (S.C. Ct. App. 1984), <u>quashed</u> <u>in</u> <u>part</u> <u>on</u> <u>other</u> <u>grounds</u>, 287 S.C. 190 (1985)). This maxim is not targeted simply at impermissible double-recovery, as <u>Criss</u> may imply. Rather, from the outset of a case, an "assault claim encompass[es] claims for [IIED] arising out of the assault," such that a "plaintiff may present his claim for intentional infliction of emotional distress as a part of his assault claim." <u>Bankhead</u>, 23 Wash. App. at 638; <u>see</u> <u>also</u> <u>Todd</u>, 283 S.C. at 173 ("The tort of outrage was designed not as a replacement for the existing tort

actions.  Rather, it was conceived as a remedy for tortious
conduct where no remedy previously existed.").  For example, in
Searls v. West Virginia Regional Jail, the court dismissed a
claim for IIED where the underlying conduct also formed the
foundation for the plaintiff's claims for "sexual battery, civil
battery, sexual assault, and assault."  No. 3:15-cv-09133, 2016
WL 4698547, at *4 (S.D. W. Va. Sept. 7, 2016) (Chambers, J.);
see also Settle v. Hall, No. 2:11-cv-00307, 2012 WL 1831845, at
*2 (S.D. W. Va. May 18, 2012) (Copenhaver, Jr., J.) (permitting
a claim for IIED to proceed where the conduct underlying the
IIED claim occurred after the alleged assault and battery).

     Troopers Lowe and Comer argue that Mr. Compton's claim
for IIED is barred by Criss inasmuch as the alleged facts
underlying the claim also are the foundation for his surviving
claims of assault and battery.  To be sure, Mr. Compton frames
the events engendering his emotional distress as the alleged
events of his arrest – the alleged assault and battery - on
October 8, 2014.  (See Resp. Opp'n 4-5.)  Compare Settle, 2012
WL 1831845, at *2.  Accordingly, Troopers Lowe and Comer's
motion for summary judgment on Count VI is granted.

     B. Bystander Liability

     42 U.S.C. § 1983 subjects to liability

> [e]very person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof
> to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws.

The Fourth Circuit "recognizes a cause of action [under § 1983] for bystander liability 'premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them.'" Stevenson v. City of Seat Pleasant, 743 F.3d 411, 416-17 (4th Cir. 2014) (quoting Randall v. Prince George's Cty., 302 F.3d 188, 203 (4th Cir. 2002)). To prevail, a plaintiff must show that the defendant police officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." Randall, 302 F.3d at 204 (footnote omitted); see also Thomas v. Holly, 533 F. App'x 208, 221 (4th Cir. 2013) ("[A]ny bystander liability . . . must be based upon being a bystander to the unconstitutional conduct of [the offending officers].").

The record reveals that the Troopers arrested Mr. Compton on October 8, 2014. Otherwise, the parties recall significantly different stories. Mr. Compton claims that he was ambushed, beaten, interrogated, and tortured by unknown police officers. Troopers Lowe and Comer admit that they, along with

Sergeant Berry, were Mr. Compton's arresting officers.  Mr. Compton evidently does not dispute that no other officers were involved, since he has dismissed his claims against the other officers.  However, Troopers Lowe and Comer paint a starkly different image than Mr. Compton, alleging that the Troopers used only an amount of force necessary to apprehend Mr. Compton against his resistance.

Despite the parties' competing accounts, Trooper Lowe nonetheless insists that he is insulated from bystander liability based upon a statement made by our circuit court, (Mem. Supp. 23): "The very essence of bystander liability . . . is premised on an individual's passivity and nonparticipation while another individual violates a person's constitutional rights — not on the bystander actively causing the harm," Stevenson, 743 F.3d at 419 (citation omitted).  According to Trooper Lowe, "[Mr. Compton] cannot simultaneously claim that [Trooper] Lowe passively observed [Mr. Compton] being injured while also holding him responsible for excessive force, assault, and battery due to the manner in which the officers arrested and interrogated [Mr. Compton]."  (Reply Supp. 4-5.)  In other words, Trooper Lowe contends that, because Mr. Compton accuses him of excessive force, assault, and battery related to the events of Mr. Compton's arrest, he ipso facto cannot also be a

bystander during the arrest.  (<u>See</u> Mem. Supp. 23; Reply Supp. 4-5.)

At the outset, Trooper Lowe errs to the extent he argues that Mr. Compton cannot pursue relief against him under alternate theories.  On the contrary, according to the Federal Rules of Civil Procedure, alternative theories of relief "may properly be pleaded, and if sufficiently supported by evidence, analyzed by the trier of fact as alternative grounds of relief." <u>Wright v. Nat'l Archives & Records Serv.</u>, 609 F.2d 702, 711 (4th Cir. 1979) (citing Fed. R. Civ. P. 8(e)(2), 41(b)).  Thus, inasmuch as Trooper Lowe argues that Mr. Compton cannot proceed under alternate theories, his argument is without merit.[3]

The issue then becomes whether a reasonable jury could conclude that Trooper Lowe was a bystander to a deprivation of Mr. Compton's rights.  Ostensibly, Trooper Lowe also argues that he cannot be a bystander to the alleged deprivation of Mr.

---

[3] Of course, Mr. Compton cannot ultimately doubly recover under two separate theories of a single § 1983 claim:

> Obviously, as alternative theories and not separate claims they may not be applied to establish multiple violations on the same facts, but short of this no procedural election between them is required of a claimant at either pre-trial, trial, or appellate stages.

<u>Id.</u>

Compton's rights by Trooper Comer and, at the same time, actively participate in harming Mr. Compton, albeit within constitutional limits.  See Stevenson, 743 F.3d at 419.  That assertion is superficially appealing inasmuch as an active participant in an event arguably cannot be considered a bystander to the distinct and similar actions therein.  Cf. Bystander, Black's Law Dictionary (10th ed. 2014) ("Someone who is present when an event takes place, but who does not become directly involved in it.").  As explained below, however, this argument is also meritless.

The purpose of bystander liability is to extend the radius of culpability to those police officers who fail to act in the presence of another officer's unconstitutional behavior. See Randall, 302 F.3d at 203.  Of course, the bystander officer also must have knowledge of the unconstitutional act and "a reasonable opportunity to prevent the harm," id. at 204, apparently leading most litigation to focus on officers simply at the scene or outskirts of an incident, see, e.g., Gunsay v. Mozayeni, 695 F. App'x 696, 702-03 (4th Cir. 2017) (discussing the bystander liability claims against two officers who "were in the immediate vicinity" and "also were present during" alleged deprivations of the plaintiff's constitutional rights by other officers); Thomas, 533 F. App'x at 221-23 (discussing the

bystander liability claims against officers who were generally at the scene but had no contact with the plaintiff); Dunn v. Nicholas Cty, 2:14-cv-25532, 2015 WL 6964693, at *5-6 (S.D. W. Va. Nov. 10, 2015) (analyzing the bystander liability claim against an officer who was outside the house in which alleged constitutional violations were perpetrated). But bystander liability is not limited to an officer who idly stands watch, wholly separated from the victim: it also applies to an officer who actively participates in a larger incident yet whose conduct otherwise falls short of a constitutional violation.

The Fourth Circuit's recent opinion in Thompson v. Virginia is instructive here. 878 F.3d 89 (4th Cir. 2017). In that case, the court concluded that an inmate, Mr. Thompson, possessed a viable claim against an officer "under the deliberate indifference standard," id. at 107, "which is similar in principle" to bystander liability, id. at 107 n.5 (citing Randall, 302 F.3d at 204). Two officers, Officer Cooper and Officer Diming, allegedly gave Mr. Thompson "a so-called 'rough ride' . . . in a [prison] van." Id. at 94. The officers restrained Mr. Thompson such that he could not buckle his seatbelt; the officers refused to buckle Mr. Thompson's seatbelt; and Officer Cooper allegedly "drove erratically," causing Mr. Thompson to be thrown around the back of the van and

inflicting upon him multiple injuries to "his forehead, hands, and arms." See id. at 94-95.

Specifically, regarding Officer Diming's role, the court stated as follows:

> [Officer] Diming refused to buckle [Mr. Thompson's] seatbelt, ignored his pleas for help, failed to intervene to stop [Officer] Cooper's unlawful use of force, and instead verbally taunted and harassed him. Unlike [Officer] Cooper, who drove the van, [Officer] Diming did not use unlawful force against Mr. Thompson — rather, he failed to do anything to stop it.

Id. at 107. Thus, despite Officer Diming's active participation in preparing Mr. Thompson for transportation, the Fourth Circuit nonetheless recognized that Officer Diming was, in principle, a bystander to the alleged deprivation of Mr. Thompson's rights by Officer Cooper.

Additionally, the district case Lester v. City of Gilbert shines further light on the bystander issue in the present case. 85 F. Supp. 3d 851 (S.D. W. Va. 2015) (Johnston, J.). In Lester, two plaintiffs alleged that a group of police officers, including an Officer Glanden, kicked in the doors of their trailer and "beat [them] savagely." See id. at 855-56. Over the course of litigation, the plaintiffs could not "affirmatively identify [Officer] Glanden as one of the officers who used force against them. At best, . . . Plaintiffs [could] merely show that [Officer Glanden] was present during the

alleged beating." Id. at 858. Nevertheless, the court in

Lester found that the plaintiffs retained a viable bystander

liability claim against Officer Glanden. See id. at 859.

Officer Glanden insisted "that [he] had no reasonable

opportunity to prevent the alleged beating" because he could not

have overpowered the other police officers. Id. The district

court rejected that argument, concluding as follows:

> Plaintiffs testified that [Officer] Glanden had told
> them he would be bringing "hell" with him when he came
> back to their trailer. [One of the plaintiffs]
> testified that, while officers stomped on his disabled
> leg, [Officer] Glanden told him that "this ain't cops
> on TV. This is real cops." Plaintiffs further
> testified that [Officer] Glanden came into their
> trailer together with the other officers and was in or
> near their small trailer over the course of the entire
> fifteen to thirty minutes during which the alleged
> beatings took place. Based on this evidence a
> reasonable jury could find that [Officer] Glanden was,
> far from a powerless bystander, in fact a ringleader
> who instigated the alleged beatings, who made no
> attempt to prevent the officers from initiating their
> attack, who actively encouraged the beatings, and who
> made no attempt to persuade the other officers to stop
> their attack despite ample time and opportunity to do
> so. At the very least, a genuine issue of material
> fact remains as to whether [Officer] Glanden had a
> reasonable opportunity to intervene.

Id.

As Thompson and Lester demonstrate, passivity –

strictly speaking – is not a predicate to bystander liability.

Rather, for his bystander liability claim against Trooper Lowe

to lie, Mr. Compton need only prove that Trooper Lowe "(1)

kn[ew] that a fellow officer [was] violating [his] constitutional rights; (2) ha[d] a reasonable opportunity to prevent the harm; and (3) ch[ose] not to act." Randall, 302 F.3d at 204 (footnote omitted). The fact that Trooper Lowe had an active role in Mr. Compton's arrest is of no moment if he also stood by while another officer deprived Mr. Compton of his constitutional rights.

Reading the record in the light most favorable to Mr. Compton, a reasonable jury could conclude that Trooper Lowe indeed used only a constitutional level of force, while at the same time find that, for example, Trooper Comer's employment of the police dog was plainly excessive and in violation of Mr. Compton's constitutional rights. Mr. Compton's excessive force claim against Trooper Lowe would thus fail; his bystander liability claim against Trooper Lowe would be preserved.

Although Mr. Compton cannot identify his alleged attackers, (Compton Dep. 66), Troopers Lowe and Comer sufficiently describe their respective roles. Trooper Lowe acknowledges his presence at the time the dog was used, testifying that he helped handcuff Mr. Compton while the dog was on Mr. Compton's arm. (Lowe Dep. 20.) Trooper Comer also testifies that he alone controlled the dog. (Comer Dep. 9.) Troopers Lowe and Comer contest the nature of the dog bite, but

the court is ill-equipped to resolve that dispute at this juncture. Indeed, Mr. Compton insists that the dog initially bit him after he had been ambushed and while he was unconscious, and that the dog bite persisted for five minutes. (Compton Dep. 67-69.) At this point, it suffices that Trooper Lowe was present during and adjacent to the incident. Consequently, taken in the light most favorable to Mr. Compton, Trooper Lowe's proximity afforded him a reasonable opportunity to intervene while Trooper Comer allegedly sicced the dog on an unconscious Mr. Compton's arm, where it "chew[ed]" him for five minutes. (See Compton Dep. 67-69.)

Trooper Lowe thus stands squarely in the shoes of Officers Diming and Glanden. Just as those officers had active roles adjacent to direct constitutional violations, so too did Trooper Lowe arrest Mr. Compton and allegedly stand by while another officer, as related by Mr. Compton, deprived Mr. Compton of his constitutional rights. Accordingly, there exist genuine disputes of material fact sufficient for a jury to find in favor of Mr. Compton's bystander liability claim against Trooper Lowe.

Finding that Mr. Compton's bystander liability claim against Trooper Lowe survives summary judgment does not necessarily end the matter. Trooper Lowe failed to assert the defense of qualified immunity as to bystander liability, but the

22

court finds good cause to address it anyway because of the strong public interests buttressing the defense. Harlow v. Fitzgerald, 457 U.S. 800, 813-14 (1982) (discussing the public's interest in the qualified immunity defense); see also Williams v. Benjamin, 77 F.3d 756, 770-71 (4th Cir. 1996) (Hamilton, J., concurring) (stating that a district judge could consider on remand the defense of qualified immunity despite the defendants' failure to assert it); Brickyard Holdings, Inc. v. Beaufort Cty., 586 F. Supp. 2d 409, 414 (D.S.C. 2007) (addressing qualified immunity when it was not asserted). But see Mobley v. Greensboro City Police Dep't, No. 1:17CV114, 2017 WL 3128106, at *4 n.2 (M.D.N.C. July 21, 2017) (" . . . Defendants failed to raise qualified immunity as a defense . . . . Therefore, the court declines to address [it] . . . ."). Nevertheless, the court has no difficulty concluding that the defense fails. "[Any] reasonable officer would have understood, under the circumstances at hand" – siccing a police dog on an unconscious and handcuffed individual, and allowing the dog to "chew" for five minutes – "that [such] behavior violated" Mr. Compton's constitutional rights. Bailey v. Kennedy, 349 F.3d 731, 741 (4th Cir. 2003). Trooper Lowe's motion for summary judgment on bystander liability is denied.

Accordingly, the following causes of action remain: Mr. Compton's Counts I (excessive force), III (battery), and IV (assault) against Sergeant Berry, Trooper Lowe, and Trooper Comer and Count IX (bystander liability) against Sergeant Berry and Trooper Lowe.

## IV. Conclusion

For the foregoing reasons, the court ORDERS as follows:

1. that Ms. Pauley's claims be, and hereby are, dismissed;

2. that Mr. Compton's claims against Sergeant O'Bryan, Trooper Minor, Trooper Yarber, and Trooper Powers be, and hereby are, dismissed;

3. that Counts II, V, VII, and X against Sergeant Berry, Trooper Lowe, and Trooper Comer be, and hereby are, dismissed;

4. that Count IX against Trooper Comer is dismissed;

5. that Trooper Lowe and Trooper Comer's motion for partial summary judgment on Count VI be, and hereby is, granted; and

6. that Trooper Lowe's motion for partial summary judgment on Count IX be, and hereby is, denied.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record and to any unrepresented parties.

ENTER: February 9, 2018

John T. Copenhaver, Jr.
United States District Judge